**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| MS. CHERRY DAVIDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:19-cv-02101-TLP-cgc |
| v. | ) | |
| | ) | JURY DEMAND |
| ARLINGTON COMMUNITY SCHOOLS | ) | |
| BOARD OF EDUCATION and | ) | |
| SUPERINTENDENT TAMARA MASON, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Plaintiff Cherry Davidson sued Defendants Arlington Community Schools Board of Education ("the Board") and Tamara Mason ("Mason") in state court alleging a First Amendment retaliation claim under 42 U.S.C. § 1983 and state law claims for negligence and breach of the duty of good faith and fair dealing. (*See* ECF No. 1-1.)

Defendants removed this case this case to federal court. (See ECF No. 1.) And they now move for summary judgment. (ECF No. 25.) Plaintiff has responded. (ECF No. 41.) And Defendants have replied. (ECF No. 45.)

For the reasons below, the Court **GRANTS** Defendants' motion for summary judgment.

## BACKGROUND

I.    **Factual Background**

    A.    **Plaintiff, Mason, and the Arlington Community Schools District**

In a municipal election in 2013, Arlington, Tennessee formed the Arlington Community Schools ("ACS") District.  (ECF No. 41-1 at PageID 1106.)  Its first school board of education chose Mason as the first Superintendent.  (*Id.*)

Donelson Elementary School, Arlington Elementary School, Arlington Middle School, and Arlington High School—once part of Shelby County Schools—became members of the ACS starting with the 2014-2015 school year.  (*Id.*)  And "Plaintiff served as Principal of Donelson Elementary School from the beginning of the 2014-15 school year through the 2017–2018 school year."  (*Id.*)

    B.    **Climate Surveys and Exit Interviews**

As part of its yearly operations, the Tennessee Department of Education "conducts anonymous educator surveys" for elementary schools, middle schools, and high schools.  (*Id.* at PageID 1109.)  The parties agree that these surveys are generally known "as 'climate' surveys."  (*Id.* at PageID 1109–10.)

Furthermore, within the ACS system, "[w]hen an employee leaves . . . , an effort is made to conduct an exit interview."  (*Id.* at PageID 1110.)  "During the 2014-15 and 2015-16 school years, those interviews were conducted by the Principal of each school.  For later school years, a change was made whereby individuals in the human resources department began to conduct the exit interviews."  (*Id.*)

### C.      Plaintiff and Mason Meet

In May 2017, "after reviewing the climate survey for Donelson Elementary School and the exit interviews of Donelson Elementary School teachers who had resigned," Mason sent Plaintiff an email to schedule a meeting.[1]  (*Id.*; *see also* ECF No. 25-9 at PageID 492.)  The purpose of the meeting was to discuss "the number of resignations from Donelson and information from the exit conferences to date."  (ECF No. 41-1 at PageID 1110.)

When Plaintiff and Mason met, "Mason stated that she wanted to find out what was going on and intended to make herself available to speak with teachers who wished to speak with her."  (*Id.* at PageID 1111.)  Plaintiff provided Mason with "a list of teachers with whom she would like Ms. Mason to speak, along with a list of question(s) to ask the teachers."  (*Id.*)

Later in May, Mason interviewed teachers from Donelson Elementary School and "met with Plaintiff after conducting those interviews."  (*Id.* at PageID 1112.)  Mason told Plaintiff that interviewees had said ungenerous things about Plaintiff, including that she "had no people skills; that teachers complained that she intimidated them; that she would not speak to them in the hallways; and that one-half of the teachers hated her and one-half loved her."  (*Id.*; *see also* ECF No. 25-1 at PageID 196–97, 223.)

### D.      The Car-Rider Line Problem

Three months after those interviews, near the beginning of the 2017-2018 school year, Mason drove to Donelson Elementary School with Mr. Jeff Mayo, the chief of staff of the ACS.  (ECF No. 41-1 at PageID 1114.)

---

[1] The Court notes that Defendants attached the 2017 climate surveys to their motion for summary judgment.  (See ECF No. 25-7 at PageID 399–443.)  Defendants also attached the many exit interview forms that Mason reviewed as part of her decision to demote and transfer Plaintiff.  (*See* ECF No. 25-8 at PageID 444–73; ECF No. 25-9 at PageID 474–502; ECF No. 25-10 at PageID 503–42; ECF No. 25-11 at PageID 543–61.)

A problem with the car-rider line had occurred, causing serious traffic backups.  (*Id.*)  So Mason "made a suggestion to address that problem, which Plaintiff thought was helpful."  (*Id.*)

Mason told Plaintiff that she might return "that afternoon to see if her suggestion helped." (*Id.*)  But Plaintiff responded with these words:  "I've got 200 new families.  I don't want them to think that the Principal can't handle the car-rider line."  (*Id.*)

Mason agreed to not come back and "received an e-mail from Plaintiff later that evening, advising that [Mason's] suggestion regarding the car-rider line had helped."  (*Id.* at PageID 1115.)

### E.     The Blue Ribbon School Nomination Event

With the car-rider line incident in the rearview mirror, and with the school year underway, Donelson Elementary School received good news:  a national organization had nominated it as a "Blue Ribbon School" in early 2018.  (*Id.* at PageID 1116.)  When Mason heard about it, "Plaintiff invited her to speak to the teachers at [the school] and she accepted the invitation."  (*Id.*)

At the celebration event, Mason spoke briefly, thanking the teachers for their work.  (*Id.*) After sitting down, she stood back up "and said that she would be remiss if she [did not] congratulate Plaintiff."  (*Id.*)

### F.     The New ACS Mascot

Weeks after the Blue Ribbon School celebration event, Mason's staff started working "on a new five-year strategic plan," and "[c]ommittees were assigned to work on four overarching goals."  (*Id.*)  "Tyler Hill, Director of Communications for the ACS, was the Chairman of one committee."  (*Id.*)  Mr. Hill told Mason that his committee recommended that all four ACS schools have Tigers as the same mascot.  (*Id.* at PageID 1117.)  Mason directed Mr. Hill to

discuss that recommendation with Plaintiff and Arlington Middle School's principal because "the proposed mascot change would only affect those two schools." (*Id.*)

When Plaintiff heard about Mr. Hill's recommendation, she disagreed.  She spoke first with Mason and then the Board of Education about her opposition. (*Id.*)  During a Board work session in May, Plaintiff passed out materials that she and her assistant principals had gathered to support her position that the mascot should not change. (*Id.*)

At the end of her presentation, Plaintiff said that she and her staff "would prefer that [the Board] leave [the school's mascot] as bulldogs." (*Id.*)  And the Board agreed to keep Donelson Elementary School's mascot as is, putting aside Mr. Hill's recommendation at Plaintiff's request. (*Id.*)

### G.     Plaintiff Is Demoted and Transferred

Mason met with Plaintiff on the last day of the school year. (*Id.* at PageID 1119.)

Mason advised Plaintiff that "her contract as Principal . . . would not be renewed and that she would be assigned to a teaching position." (*Id.*)

Plaintiff received assignment "to a Sixth Grade social studies position at Arlington Middle School for the 2018-19 school year that began in August, 2018." (*Id.* at PageID 1120.) "Plaintiff held the social studies position throughout the entire 2018-19 school year and still holds that position as of the date of the filing" of this case. (*Id.* at PageID 1121.)

## II.    Procedural Background

As a result of these events, Plaintiff sued Mason and the ACS in state court alleging a First Amendment claim under 42 U.S.C. § 1983 and state law claims for negligence and breach of the duty of good faith and fair dealing. (*See* ECF No. 1-1.)

As to her First Amendment claim, Plaintiff asserts that Defendants retaliated against her because of her "communication with the Board regarding the mascot." (*Id.* at PageID 12.)  In particular, Plaintiff alleges that Defendants retaliated against her because she "informed the Board that school students voted for the name of the mascot . . . and changing the name of [Donelson Elementary School] would not further the interest of the students because Mason would summarily disrupt the will of the students." (*Id.* at PageID 13.)

As to her claim for breach of the duty of good faith and fair dealing, Plaintiff argues that Defendants violated that duty "when they breached Plaintiff's contract in May 2018, demoting Plaintiff for reasons unrelated to performance and in violation of the terms of the contract." (*Id.*)

And as to Plaintiff's final claim for negligence, she argues that Mason breached her "duty to provide a quality education to the students" at Donelson Elementary School "when she failed in her responsibility to provide Plaintiff with a contract that included performance standards as required by T.C.A § 49-2-303(a)(l)." (*Id.*)  Plaintiff also claims that Mason breached that duty when, "for personal instead of professional reasons, [she] demoted Plaintiff for Plaintiff's alleged lack of people skills." (*Id.*)

Defendants later removed the case to federal court.  (ECF No. 1.)  And they now move for summary judgment.  (ECF No. 25.)  Plaintiff has responded to Defendants' motion for summary judgment (ECF No. 41).  And Defendants have replied (ECF No. 45).

For the reasons below, the Court **GRANTS** Defendants' motion for summary judgment.

## STANDARD OF REVIEW

The Court begins its analysis with the rules and cases about the summary judgment standard.

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense." *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 776 (6th Cir. 2012).

"In considering a motion for summary judgment, [the] court construes all reasonable inferences in favor of the nonmoving party." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact." *Mosholder v. Barnhardt*, 679 F.3d 443, 448 (6th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Mosholder*, 679 F.3d at 448–49; *see also* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 587. If "the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 914 (6th Cir. 2013) (quoting *Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (en banc)) (internal quotation marks omitted); *see also Kalich v. AT & T Mobility, LLC*, 679 F.3d 464, 469 (6th Cir. 2012).

The parties must cite "to particular parts of materials in the record" to "show that a fact is, or is not, genuinely disputed," "showing that the materials cited do not establish the absence or presence of a genuine dispute" or showing "that an adverse party cannot produce admissible

evidence to support the fact." *Bruederle*, 687 F.3d at 776 (alterations in original) (quoting Fed. R. Civ. P. 56(c)(1)); *see also Mosholder*, 679 F.3d at 448 ("To support its motion, the moving party may show 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Martinez*, 703 F.3d at 914 (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "[T]he district court has no 'duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Pharos Capital Partners, L.P. v. Deloitte & Touche*, 535 F. App'x 522, 523 (6th Cir. 2013) (per curiam) (quoting *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008), *abrogation recognized by Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015)).

Ultimately, the "question is whether 'the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law.'" *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 251–52). Summary judgment "'shall be entered' against the nonmoving party unless affidavits or other evidence 'set forth specific facts showing that there is a genuine issue for trial.'" *Rachells v. Cingular Wireless Employee Services*, LLC, No. 1:08 CV 02815, 2012 WL 3648835, at *2 (N.D. Ohio Aug. 23, 2012) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990)).

"[A] mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence

upon which a reasonable jury could find in her favor." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (quoting *Liberty Lobby*, 477 U.S. at 251). "[T]o withstand a motion for summary judgment, the party opposing the motion must present 'affirmative evidence' to support his/her position." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992) (quoting *Liberty Lobby*, 477 U.S. at 247–254; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). "[C]onclusory assertions, unsupported by specific facts made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment." *Rachells*, 2012 WL 3648835, at *2 (quoting *Thomas v. Christ Hosp. and Med. Ctr.*, 328 F.3d 890, 894 (7th Cir. 2003)). Statements in affidavits that are "nothing more than rumors, conclusory allegations and subjective beliefs" are insufficient. *See Mitchell*, 964 F.2d at 584–85.

## ANALYSIS

### I.     First Amendment Retaliation Claim

Plaintiff appears to assert a First Amendment retaliation claim under 42 U.S.C. § 1983 against both Mason and the Board. (*See* ECF No. 1-1 at PageID 12) (claiming Defendants are liable under 42 U.S.C. § 1983 "because the ACS through Mason acting under the color of state law[] violated Plaintiff's rights protected by the First Amendment's protection for free speech").

But before the Court proceeds with an analysis of Plaintiff's First Amendment claim, it must first identify the precise speech at issue in this case. The Court will address this question first.

### A.     The Speech at Issue

As a preliminary matter, the Court finds that the parties at the summary judgment stage have apparently widened the scope of Plaintiff's complaint. Plaintiff's complaint focuses its

First Amendment retaliation claim on Plaintiff's specific comments about Mr. Hill's mascot recommendation. (*See* ECF No. 1-1 at PageID 12–13.)  But, on summary judgment, the parties have also focused on the comments Plaintiff made about the car-rider line.  (*See e.g.,* ECF No. 25-39 at PageID 1032; ECF No. 41 at PageID 1089.)

The Court assumes that the parties have done so to cover all potentially actionable speech presented in the complaint, not just the speech presented in "Causes of Action" section of the complaint (*see* ECF No. 1-1 at PageID 12–13).  In analyzing Plaintiff's First Amendment retaliation claim, the Court will thus address Plaintiff's comments about the ACS mascot as well as those made about the car-rider line.

With all that in mind, the Court will now delve into the analysis of this claim against Mason.  And for the reasons below, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiff's First Amendment retaliation claim against Mason.

### B. First Amendment Retaliation Standard

The Sixth Circuit has stated that "[i]t is long 'settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'"  *Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 461–62 (6th Cir. 2017) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)).

That said, "government offices could not function if every employment decision became a constitutional matter."  *Connick*, 461 U.S. at 143.  So "a public employee's First Amendment rights are narrower than the citizenry at large."  *Mayhew*, 856 F.3d at 462 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  Stated otherwise, "the First Amendment protects a public employee's right, *in certain circumstances*, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (emphasis added).

10

Thus, to establish a claim for First Amendment retaliation, Plaintiff must show that

> (1) [Plaintiff] engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [her] protected conduct.

*Scarbrough*, 470 F.3d at 255 (citing *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).  "If the plaintiff meets this burden, the burden of production shifts to the defendant . . . , but if the defendant can show he would have taken the same action in the absence of the protected activity, he is entitled to summary judgment."  *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586 (6th Cir. 2008) (citing *Thaddeus–X*, 175 F.3d at 399).

The "dispositive question" here is thus whether Plaintiff's protected conduct caused Defendants to demote her from principal to teacher.  *See Scarbrough*, 470 F.3d at 255.

### 1.   Protected Conduct

Under the standard provided above, the first issue that the Court has to decide is whether Plaintiff "engaged in constitutionally protected speech or conduct."  *Scarbrough*, 470 F.3d at 25.

To show that Plaintiff's speech received protection from the First Amendment, she must first meet three requirements.  First, Plaintiff must have spoken on "matters of public concern."  *Connick*, 461 U.S. at 143.  Second, Plaintiff "must speak as a private citizen and not as an employee pursuant to [her] official duties."  *Mayhew*, 856 F.3d at 462 (citing *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 338 (6th Cir. 2010)).  And third, she "must show that his speech interest outweighs 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'"  *Id.* (quoting *Evans-Marshall*, 624 F.3d at 338).

11

The Court will proceed with an analysis of these requirements.

### a. Matters of Public Concern

"Speech involves matters of public concern 'when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (other quotations omitted).

Defendants here concede "[f]or purposes of the present Motion only" that Plaintiff's comments were a matter of public concern. (ECF No. 25-39 at PageID 1027.) So the Court finds that no genuine disputes of material fact exist as to whether Plaintiff's speech about the car-rider line and the mascot were matters of public concern. The Court thus turns to whether Plaintiff made the speech at issue "as a private citizen and not as an employee pursuant to [her] official duties." *Mayhew*, 856 F.3d at 462.

### b. Private Citizen

"Determining whether an employee speaks as a private citizen or as a public employee can be challenging." *Mayhew*, 856 F.3d at 464. Above all, however, "the proper inquiry is a practical one." *Id.* (citing *Garcetti*, 547 U.S. at 424).

"To aid in the assessment of a public employee's statement, 'we must consider both its content and context.'" *Id.* (quoting *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010)). The Sixth Circuit has "recognized several non-exhaustive factors to consider, including: [1] the speech's impetus; [2] its setting; [3] its audience; and [4] its general subject matter." *Id.* (citing *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012)).

Another factor is "whether the statements were made to individuals 'up the chain of command.'"  *Handy-Clay*, 695 F.3d at 540 (quoting *Fox*, 605 F.3d at 350).

These considerations help inform the "critical question" here:  "[W]hether the speech at issue is itself ordinarily within the scope of an employee's duties."  *Lane*, 573 U.S. at 238.

### i.    The Speech About the Car-Rider Line

Defendants argue that Plaintiff's speech about the car-rider line "'owe[s] its existence' to her professional responsibilities and was clearly made in furtherance of the ordinary responsibilities of her employment and, therefore, is not protected by the First Amendment." (ECF No. 25-39 at PageID 1032.) (quoting *Garcetti*, 547 U.S. at 421; *Lane*, 573 U.S. at 235).

To this effect, Defendants point to Plaintiff's deposition, during which Plaintiff agreed that the "only reason" she did not want Mason to intervene in the car-rider line incident was because she did not want others to think she could not do her job.  (ECF No. 25-1 at PageID 130.)  Defendants also cite Plaintiff's complaint, which states that Plaintiff "did not need the Superintendent to supervise the school car rider line because she felt this would send the wrong message to new school parents."  (ECF No. 1-1 at PageID 4.)

Plaintiff offers neither argument nor fact in response to Defendants' position.  This may be because Defendants are right.  The Court thus agrees with what Defendants highlight in their reply:

> Plaintiff's Response fails to address Defendants' argument that, when she requested [Mason] not to return to see whether Mason's traffic suggestion worked because Plaintiff feared parents would think that she did not know how to do her job, Plaintiff was speaking as an employee in furtherance of the ordinary responsibilities of her position and, therefore, such speech is not protected . . . .

(ECF No. 45 at PageID 2055.)

13

And thus the Court finds that Plaintiff has not tried to show "evidence upon which a reasonable jury could find in her favor." *Tingle*, 692 F.3d at 529. So the Court "has no 'duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Pharos Capital Partners, L.P.*, 535 F. App'x at 523 (quotations omitted). The Court therefore **GRANTS** Defendants' motion for summary judgment as to Plaintiff's First Amendment claim as it relates to Plaintiff's speech about the car-rider line.[2]

### ii. The Speech About the Mascot

As to Plaintiff's speech about the mascot during the Board work session, Defendants argue that these comments "owe[d] their existence to her professional responsibilities and were made in furtherance of the ordinary responsibilities of her employment." (ECF No. 25-39 at PageID 1033.)

To support their position, Defendants point to the following undisputed facts. First, the proposed mascot change came from a five-year strategic plan that Mason and her staff had elaborated. (*See* ECF No. 41-1 at PageID 1116–17.) Second, Mason had directed Mr. Hill, who had conceived of the proposed change along with his committee, to discuss the idea with Plaintiff because she served as principal of one of the affected schools. (*Id.* at PageID 1117.) Third, as Plaintiff began her presentation to the Board during which she argued in opposition to the mascot change idea, she emphasized her position as principal claiming she "opened this school." (*Id.* at PageID 1118.) And fourth, at the end of her presentation, Plaintiff said that she and her staff "would prefer that [the Board] leave [the school's mascot] as bulldogs." (*Id.*)

---

[2] Defendants also argue that, "[a]ssuming that [Plaintiff's] comments were protected, however, any claim based thereon is time-barred." (ECF No. 25-39 at PageID 1032.) But because Plaintiff has not sufficiently shown that Plaintiff made her comments about the car-rider line as a private citizen, the Court need not reach this argument. *See Mayhew*, 856 F.3d at 462.

Under these facts, Defendants claim that Plaintiff appeared before the Board "as Principal" of Donelson Elementary School to oppose the mascot change.  (ECF No. 25-39 at PageID 1034.)

In other words, they claim that attending the Board work session represented "an 'ad-hoc' or 'de-facto' duty as part of Plaintiff's responsibilities as Principal to report her opinion to the Board regarding the proposed mascot change."  (*Id.*) (quoting *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544 (6th Cir. 2007) (explaining that "ad hoc or de facto duties can fall within the scope of an employee's official responsibilities despite not appearing in any written job description").  And the comments made during the Board work session constituted "a quintessential taking it 'up the chain of command' comment related to [Plaintiff's] employment, which is not protected speech by a citizen."  (*Id.*) (citing *Fox*, 605 F.3d at 350) (supporting the idea that "when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job") (internal quotation omitted).

In response, Plaintiff argues that she "was clearly speaking as a private citizen instead of a public employee at the board meeting."  (ECF No. 41 at PageID 1091.)  In support of her position, Plaintiff cites her own declaration.  It says:

> 83.     As a condition of my employment[,] I was not required to attend board meetings or board work sessions and anytime I went, I was going after work hours not as an employee of Arlington Community School District.

(ECF No. 41-2 at PageID 1154.)  Plaintiff thus claims that, "because Plaintiff was under no obligation to attend the board meeting as an employee of Arlington Community School District, she attended the meeting as a private citizen . . . ."[3]  (ECF No. 41 at PageID 1091.)

The Court now turns to its analysis.  For the reasons below, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiff's First Amendment claim relating to her speech about the mascot.

Despite Plaintiff's claims to the contrary, the Court finds that her speech during the Board work session "is itself ordinarily within the scope of an employee's duties."  *Lane*, 573 U.S. at 238.

First, the "impetus" of Plaintiff's speech related to her duties as principal.  *Mayhew*, 856 F.3d at 464.  In attending the Board work session, Plaintiff wanted to explain why she, as principal, thought changing the mascot would not be in Donelson Elementary School's best interests.  (ECF No. 41-2 at PageID 1153.)   One reason she gave was that "the children loved Buddy the Bulldog," and that the mascot "was a large part of the school's culture."  (*Id.*) Plaintiff even distributed materials that she and her assistant principals had prepared to make her case.  (ECF No. 41-1 at PageID 1118.)

The Court finds that Plaintiff intended her presentation to convince the Board that the proposed mascot change would harm Donelson Elementary School's "legacy," an issue of

---

[3] Plaintiff cites no law that supports the idea that attending functions "after work hours," be it for professional reasons or otherwise, necessarily entails acting as a private citizen.  (ECF No. 41-2 at PageID 1154.)  And even still, her employment contract for the 2017-2018 school year provides that she is "required to perform additional duties outside of regular school hours," and that "failure to perform such additional duties assigned by his/her Supervisor and/or ACS Superintendent shall be grounds for terminating [the] Employment Contract[.]"  (ECF No. 25-3 at PageID 283.)  The plain language of Plaintiff's employment contract thus contradicts Plaintiff's statement.

obvious concern for her as the school's principal.  (ECF No. 25-19 at PageID 803.)  Plaintiff made this fact clear in her concluding words to the Board:  "*I would prefer and I feel like my staff* would prefer that you just leave *us* as bulldogs."  (*Id.* at PageID 805) (emphasis added.)  All in all, the Court is convinced that Plaintiff argued to the Board to eschew Mr. Hill's recommendation about the school mascot as Principal of the school, not a private citizen.

Second, the "setting" of Plaintiff's speech was undeniably professional.  *Mayhew*, 856 F.3d at 464.  The undisputed record shows that Board work sessions are opportunities for the Board to make decisions about the ACS.  This fact would explain why Mason invited Plaintiff to discuss the proposed mascot change there, rather than another venue.  (*See* ECF No. 41-2 at PageID 1153.)

Third, the "audience" of the presentation weighs against finding that Plaintiff made her speech as a private citizen.  *Mayhew*, 856 F.3d at 464.  According to the undisputed facts, only members of the Board attended Plaintiff's presentation.  (*See* ECF No. 25-19 at PageID 800– 812.)

Fourth, the "general subject matter" of Plaintiff's speech related to matters within her professional responsibilities.  *Mayhew*, 856 F.3d at 464.  During her presentation, Plaintiff explained that, when she "opened" the school, having Buddy the Bulldog as the mascot "really bec[a]me the fabric of [the school's] culture."  (ECF No. 25-19 at PageID 801.)  "We use it all the time," Plaintiff said, "'be a buddy, you know, 'be a friend.'"  (*Id.*)

She also explained that the school's mascot was a point of "pride."  (ECF No. 25-19 at PageID 803.)  As she said to the Board:  "Many of you came to *my* national Blue Ribbon

nomination[4], so *we* have gained national attention as Donelson and as Donelson Bulldogs."
(*Id.*) (emphasis added.)

Reviewing the factors laid out in *Mayhew*, 856 F.3d at 464, leads the Court to conclude
that the "content and context" of Plaintiff's presentation to the Board derived from her duties as
principal. *Fox*, 605 F.3d at 348.

At no point did she identify herself—even implicitly—"as a citizen taxpayer."
*Stinebaugh v. City of Wapakoneta*, 630 F. App'x 522, 528 (6th Cir. 2015). And the entire
purpose of Plaintiff's presentation was to argue against a proposed change that she interpreted
as an affront to decisions she had made as principal of Donelson Elementary School when she
opened the school. (*See* ECF No. 25-19 at PageID 800–812.)

The undisputed facts also show that the purpose of Plaintiff's presentation was to raise
professional concerns "to individuals 'up the chain of command.'" *Handy-Clay*, 695 F.3d at
540 (quoting *Fox*, 605 F.3d at 350).

Before the board work session—during a "principal meeting," no less—Plaintiff told
Mason that she hoped to voice her disagreement with the proposed mascot change to the Board,
but that she "didn't want to do that without [Mason's] permission." (ECF No. 41-2 at PageID
1153.) Only at that point did Mason invite Plaintiff "to come to the next board meeting." (*Id.*)
These facts alone suggest that Plaintiff made her speech to the Board as principal of Donelson
Elementary School, not as a private citizen. *See Burgess v. Paducah Area Transit Auth.*, 387 F.
App'x 538, 545 (6th Cir. 2010) ("[C]ourts have consistently held that 'when a public employee
raises complaints or concerns up the chain of command at his workplace about his job duties,
that speech is undertaken in the course of performing his job.'") (internal quotation omitted).

---

[4] She was referring to the school's nomination as a Blue Ribbon school.

In short, the Court finds that the undisputed facts show that Plaintiff made her speech to the Board as principal of Donelson Elementary School, not as a private citizen.  So the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiff's First Amendment claim as it relates to Plaintiff's speech about the proposed mascot change.

### C.    Municipal Liability

Finally, to the extent Plaintiff has asserted a First Amendment retaliation claim against the Board based on Mason's allegedly tortious conduct, that claim cannot stand.  The law is clear.

Under well-settled precedent, courts cannot hold a city government entity, such as the Board here, liable "solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  *Monell v. Dep't. of Soc. Serv.*, 436 U.S. 658, 691 (1978); *see also Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).  Similarly, courts cannot hold a municipality responsible for a constitutional deprivation unless there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.  *Monell*, 436 U.S. at 691–92; *Deaton v. Montgomery Cty., Ohio*, 989 F.2d 885, 889 (6th Cir. 1993).

As a result, to establish municipal liability, a plaintiff "must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy."  *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)).  "[T]he touchstone of 'official policy' is designed 'to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'"  *City of St. Louis v. Praprotnik*, 485

U.S. 112, 138 (1988) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479–80 (1986)) (emphasis in original).

Plaintiff has put forth no evidence here that she suffered an injury because of an unconstitutional "policy or custom" of the Board.  *Alkire*, 330 F.3d at 815.  Nor have the parties addressed this issue on summary judgment.

Thus, to the extent Plaintiff has stated a First Amendment retaliation claim against the Board, the Court **GRANTS** Defendants' motion for summary judgment and **DISMISSES** that claim **WITH PREJUDICE**.

## II.    Breach of the Duty of Good Faith and Fair Dealing

Plaintiff anchors her second claim to her contract.

She claims that "Mason breached [the duty to provide a quality education to the students attending the ACS] when she failed in her responsibility to provide Plaintiff with a contract that included performance standards as required by T.C.A § 49-2-303(a)(1)."  (ECF No. 1-1 at PageID 13.)  She also alleges that ACS and Mason "breached their duty of good faith and fair dealing when they breached Plaintiff's contract in May 2018, demoting Plaintiff for reasons unrelated to performance and in violation of the terms of the contract."  (*Id.*)  According to Plaintiff, demoting her was "not in the best interest of the children in ACS" because she "exceeded expectations regarding her performance and more importantly lead [sic] Donelson Elementary School when it was nominated for and achieved the National Blue Ribbon award for academic excellence."  (*Id.*)

In their motion for summary judgment, Defendants argue that Plaintiff's breach of the duty of good faith and fair dealing claim fails as a matter of law for many reasons.

First, they argue that the Tennessee Supreme Court has held that "a statute applicable to educator contracts 'forms a part of the contract in the same manner as if it had actually been written or copied into the contract.'" (*Id.*) (quoting *McMinn County Bd. of Ed. v. Anderson*, 292 S.W.2d 198, 200 (Tenn. 1956)).  Second, "it is undisputed that the Board adopted the State evaluation model and that, contrary to the conclusory allegation of the Complaint, Plaintiff's evaluations did, in fact, include student achievement data." (*Id.*)  Third, "it is undisputed that Plaintiff's Principal contract vested the Superintendent with discretion not to renew the contract and to assign Plaintiff to a teaching position." (*Id.* at PageID 1044.)  Fourth, "[t]o the extent that Plaintiff seeks to argue that the Board somehow interfered with her contract, the Board has immunity pursuant to [T.C.A.] § 29-20-205." (*Id.*)  And fifth, "Mason . . . is not a proper party to Plaintiff's breach of contract claim. Plaintiff conceded during her deposition that she has no contract with Ms. Mason in her individual capacity." (*Id.*)

Plaintiff counters that "it is well settled law in Tennessee[] that a Principal may file a direct cause of action in State Court to challenge a demotion and transfer to a teaching position." (ECF No. 41 at PageID 1099) (citations omitted.)

She then goes on to argue that even though her "Complaint is couched in terms of breach of contract, the demotion and transfer at issue in this case implicates T.C.A. § 49-5-510 and constitutes Plaintiff's evidence of the breach." (*Id.*)  In support of that position, Plaintiff argues that her contract lacked "student achievement data as required by T.C.A. § 49-2-303(a)." (ECF No. 41 at PageID 1101.)  Plaintiff also claims that her demotion violated a Board policy that governs the assignment and transfer of school personnel to vacancies in the school system. (*Id.*) (citing ECF No. 42-7 at PageID 2012.)  Finally, Plaintiff argues that her demotion and transfer was unlawful because "Mason did not consider Plaintiff's performance in all other respects as

Plaintiff's evaluation for 2016-2017 was excellent and so was Plaintiff's evaluation for 2017-2018 school year." (*Id.*)

At this point, having laid out the parties' basic positions, the Court will pause and take a closer look at two issues that require analysis before moving onto the merits of Plaintiff's breach of the duty of good faith and fair dealing claim.

The first issue is Plaintiff's suggestion that her good faith and fair dealing claim somehow "implicates" T.C.A. § 49-5-510—that is, the Teachers' Tenure Act, § 49–5–501, *et seq.* (ECF No. 41 at PageID 1099.) The second issue is Defendants' argument that Mason "is not a proper party to Plaintiff's breach of contract claim." (ECF No. 25-39 at PageID 1044.) The Court takes on these issues in turn.

### A.    Teachers' Tenure Act

As mentioned above, Plaintiff states in her response that "the demotion and transfer at issue in this case implicates T.C.A. § 49-5-510 and constitutes Plaintiff's evidence of the breach" of the duty of good faith and fair dealing. (ECF No. 41 at PageID 1099.)

In their reply, Defendants argue that Plaintiff's attempt to assert a claim under the Teachers' Tenure Act is inappropriate for two reasons. "First, courts have routinely refused to consider claims that, as here, were not properly raised in a complaint or amended complaint." (ECF No. 45 at PageID 2064) (citation omitted.) And "[s]econd, it is well established that a new claim or theory cannot be asserted in response to a motion for summary judgment." (*Id.*) (citations omitted.)

If Plaintiff is trying to assert a claim under the Teachers' Tenure Act, the Court finds Defendants' position well-taken. For the reasons below, the Court finds that raising a claim under the Teachers' Tenure Act is inappropriate at this stage in the litigation.[5]

For one, courts have consistently interpreted allegations of improper demotions and transfers under the Teachers' Tenure Act as stand-alone causes of action. *See e.g., Barbee v. Union City Bd. of Educ.*, 559 F. App'x 450 (6th Cir. 2014); *Kelley v. Shelby Cty. Bd. of Educ.*, 751 F. App'x 650 (6th Cir. 2018); *Brown v. Bd. of Educ. of Shelby Cty. Sch.*, 47 F. Supp. 3d 665 (W.D. Tenn. 2014); *Randall v. Memphis City Sch.*, No. 09-2267-STA, 2010 WL 4392538 (W.D. Tenn. Oct. 29, 2010); *Haynes v. Shelby Cty. Bd. of Educ.*, No. 2:17-cv-2305-SHL-cgc, 2018 WL 1558284 (W.D. Tenn. Jan. 30, 2018).

And so to properly assert this cause of action, Plaintiff needed to have made her claim under the Teachers' Tenure Act before the deadline for amending her pleadings passed and the parties got to the summary judgment stage. *See* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a)."). "To permit a plaintiff to do otherwise would subject defendants to unfair surprise." *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (citations omitted).

---

[5] In fact, Plaintiff recently moved to amend her complaint to assert such a claim and the Court denied that Motion. (ECF No. 58.)

Second, if Plaintiff suggests that she properly presented her claim under the Teachers'
Tenure Act in her complaint—as Plaintiff's counsel argued during a recent status conference
(*see* ECF No. 52)—this argument is unavailing as well.

Most basically, Plaintiff did not cite the Teachers' Tenure Act in her complaint at all.
Her contractual cause of action derives from allegations that Mason did not include performance
standards in her contract, and that Defendants breached their duty of good faith and fair dealing
by demoting Plaintiff from principal to teacher.  (*See* ECF No. 1-1 at PageID 13.)

Furthermore, contrary to Plaintiff's position (*see* ECF No. 41 at PageID 1099), the Court
finds that alleging an improper demotion and transfer does not necessarily implicate the
Teachers' Tenure Act.

Plaintiff admits in her response, "Plaintiff alleged in the Complaint that Defendants
breached their duty of good faith and fair dealing with plaintiff when Mason demoted Plaintiff
and Plaintiff also alleged in the Complaint that Defendant unlawfully transferred Plaintiff from
the position of Principal to School Teacher in violation of her Contract."  (ECF No. 41 at
PageID 1099.)  Based on this statement, Plaintiff draws the wrong conclusion—that Mason's
alleged violation of the duty of good faith and fair dealing "falls under [the Teachers' Tenure
Act] in demoting and transferring Plaintiff."  (*Id.*)  Instead, the more appropriate conclusion is
that Plaintiff never tried to state a claim under the Teachers' Tenure Act until now.[6]

For these reasons, therefore, the Court finds that Plaintiff has not raised an independent
cause of action under the Teachers' Tenure Act.  The Court thus declines to assess the merits of
any such claim at this stage in the litigation.

---

[6] Plaintiff even tried to amend her complaint to assert a claim under the Teachers' Tenure Act
after the parties completed their summary judgment briefing.  (ECF No. 51.)  For reasons much
like those provided here, the Court denied that motion.  (ECF No. 58.)

That said, and to be clear, if Plaintiff seeks to use the requirements of the Teachers' Tenure Act as evidence for her breach of the duty of good faith and fair dealing claim, that is her decision to make. If the case gets to trial, the Court will then assess whether that evidence provides support for her breach of the duty of good faith and fair dealing claim here.

But, before getting there, the Court will decide whether Mason is a proper party to Plaintiff's breach of the duty of good faith and fair dealing claim. The Court turns to this issue next.

**B.    Mason Is Not a Proper Party to the Breach of the Duty of Good Faith and Fair Dealing Claim**

Defendants argue that Mason, "who has been sued only in her individual capacity, is not a proper party to Plaintiff's breach of contract claim." (ECF No. 25-39 at PageID 1044.)

Rather than responding to this argument, Plaintiff instead claims generally that Defendants breached their duty of good faith and fair dealing by demoting and transferring Plaintiff to a new position. (*See* ECF No. 41 at PageID 1099–1103.)

The Court finds Defendants' position to be well-founded. So if Plaintiff has sued Mason, individually, for breach of the duty of good faith and fair dealing, the Court **DISMISSES** that claim.

To establish a breach of contract claim, including one for a breach of the duty of good faith and fair dealing, a plaintiff must show "the existence of an enforceable contract." *Tolliver v. Tellico Vill. Prop. Owners Ass'n, Inc.*, 579 S.W.3d 8, 25 (Tenn. Ct. App. 2019) (quotation omitted).

Plaintiff admitted during her deposition here that "her employment contract was not with" Mason. (ECF No. 25-1 at PageID 200–01.) Instead, her relationship with Mason

stemmed from "the professional relationship that [she] had as principal with the superintendent[.]"  (*Id.* at PageID 201.)

Because the undisputed evidence shows that Plaintiff had no contract with Mason, she cannot show "the existence of an enforceable contract."  *Tolliver*, 579 S.W.3d at 25.  The Court thus **DISMISSES** Plaintiff's breach of the duty of good faith and fair dealing claim against Mason.

### C.    Plaintiff's Good Faith and Fair Claim Against the Board

#### 1.    The Parties' Positions

The remaining issue for the Court to decide is whether any disputes of fact exist over whether the Board breached its duty of good faith and fair dealing toward Plaintiff.  For the sake of clarity, the Court briefly restates the parties' basic positions.

Defendants have claimed that Plaintiff's breach of the duty of good faith and fair dealing claim fails for four reasons.

First, the Tennessee Supreme Court has held that "a statute applicable to educator contracts 'forms a part of the contract in the same manner as if it had actually been written or copied into the contract.'"  (*Id.*) (quoting *McMinn County Bd. of Ed. v. Anderson*, 292 S.W.2d 198, 200 (Tenn. 1956)).  Second, "it is undisputed that the Board adopted the State evaluation model and that, contrary to the conclusory allegation of the Complaint, Plaintiff's evaluations did, in fact, include student achievement data."  (*Id.*)  Third, "it is undisputed that Plaintiff's Principal contract vested the Superintendent with discretion not to renew the contract and to assign Plaintiff to a teaching position."  (*Id.* at PageID 1044.)  And fourth, if "Plaintiff seeks to argue that the Board somehow interfered with her contract, the Board has immunity pursuant to [T.C.A.] § 29-20-205."  (*Id.*)

In response, Plaintiff first argues that *Anderson*, 292 S.W.2d 198, does not apply here because "the allegations and facts governing the statutes at issue [in that case] do not have the specific requirements of 'shall contain performance standards' [as] set forth in T.C.A § 49-1-303(a)." (ECF No. 41 at PageID 1102.)  Second, Plaintiff claims that her demotion violated a Board policy governing the assignment and transfer of school personnel to vacancies in the school system. (*Id.* at PageID 1101) (citing ECF No. 42-7 at PageID 2012.)  And third, the Board violated its duty of good faith and fair dealing because "Mason did not consider Plaintiff's performance in all other respects as Plaintiff's evaluation for 2016-2017 was excellent and so was Plaintiff's evaluation for 2017-2018 school year." (*Id.*)

The Court finds Plaintiff's arguments unavailing.  So for the reasons below, the Court **GRANTS** Defendants' motion for summary judgment and **DISMISSES** Plaintiff's good faith and fair dealing claim against the Board.

### 2.    Good Faith and Fair Dealing Claim Standard

"In Tennessee, a duty of good faith and fair dealing is imposed in the performance and enforcement of every contract." *Lamar Advert. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009) (citing *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996)).  "The purpose of this implied covenant is (1) to honor the reasonable expectations of the contracting parties and (2) to protect the rights of the parties to receive the benefits of the agreement into which they entered." *Id.* (citing *Barnes & Robinson Co. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 642–43 (Tenn. Ct. App. 2006)).

"The implied obligation of good faith and fair dealing does not, however, create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement." *Barnes & Robinson Co.*, 195 S.W.3d at 643 (quoting *Goot v.*

*Metropolitan Government of Nashville and Davidson County*, No. M2003–02013–COA–R3–CV, 2005 WL 3031638, *7 (Tenn. Ct. App. Nov. 9, 2005); *see also Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 666 (Tenn. 2013).

"The determination of what is required by the duty of good faith in a given case turns on an interpretation of the contract at issue." *Lamar Advert. Co.*, 313 S.W.3d at 791 (citing *Barnes & Robinson Co.*, 195 S.W.3d at 643). "In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable." *Barnes & Robinson Co.*, 195 S.W.3d at 643 (quoting *TSC Industries, Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987)). "Whether a party acted in good faith is a question of fact." *Lamar Advert. Co.*, 313 S.W.3d at 791 (citing *Old Republic Sur. Co. v. Eshaghpour*, No. M1999–01918–COA–R3–CV, 2001 WL 1523364, at *7 (Tenn. Ct. App. Nov. 30, 2001).

### 3. Application

#### a. Plaintiff's Contract Includes Performance Evaluation Standards

The Court finds that the Board included performance standards in Plaintiff's contract as T.C.A. § 49-2-303(a)(1) required.[7]

---

[7] The Court notes that Plaintiff's complaint stated that the Board's alleged failure to include performance standards in Plaintiff's contract amounted to negligence, not a breach of the duty of good faith and fair dealing. (ECF No. 1-1 a PageID 13.) As Defendants note, the Board would be immune from such a claim under Tennessee law. *See* T.C.A. § 29-20-205. That said, in her response, Plaintiff has morphed that claim under a theory of breach of the good faith and fair dealing, not negligence. (See ECF No. 41 at PageID 1099–1103.) For this order, the Court thus assumes without deciding that Plaintiff has properly pleaded that the Board's failure to include performance standards as T.C.A. § 49-2-303(a)(1) required would breach the duty of good faith and fair dealing.

Plaintiff also claims that the Board's alleged failure to include performance standards in her employment contract violates the Teachers' Tenure Act because it shows that her demotion and

The undisputed facts here show that Plaintiff entered into employment contracts spanning the school years 2014 through 2018 that required her to comply with specific policies issued by the Board.  (*See* ECF No. 25-3 at PageID 280–84.)

The undisputed facts also show that, "[p]rior to such time as ACS opened its schools, the [Board] adopted the State of Tennessee evaluation model ["the Evaluation Model"] for teachers and Principals."  (ECF No. 41-1 at PageID 1107.)  The Board did so by issuing a policy that adopted the Evaluation Model as part of its evaluation processes.  (*See* ECF No. 25-3 at PageID 260 ("The Board hereby adopts the State evaluation model for teachers and Principals.))

These undisputed facts thus make clear that, by agreeing to abide by policies issued by the Board, Plaintiff in turn agreed that Defendants would evaluate her under the Evaluation Model.  Plaintiff acknowledged as much in her deposition, during which she confirmed that "all of the Arlington schools adopted the [Evaluation Model] dealing with evaluations," and that Mason began evaluating her under that rubric starting in her first year as principal.  (ECF No. 25-1 at PageID 158–59.)

Having established that Plaintiff, as part of her contractual obligations, agreed that Defendants would evaluate her under the Evaluation Model, the remaining question is whether that Evaluation Model assesses student achievement data as described in T.C.A. § 49-2-303(a)(1).  The Court finds that it does.

T.C.A. § 49-2-303(a)(1) puts forward these requirements about employment contracts for school principals:

---

transfer was not in good faith and conducted "in an arbitrary and capricious manner."  (ECF No. 41 at PageID 1100) (citing *Franklin Cty. Bd. Of Educ. v. Crabtree*, 337 S.W.3d 808,  814 (Tenn. Ct. App. 2010)).  For reasons already provided, however, the Court declines to decide whether this allegation would breach the Teachers' Tenure Act.  Moreover, as the Court finds below, the Board did include performance standards in Plaintiff's employment contract.

[Employment contracts for principals] shall specify duties other than those prescribed by statute and shall contain performance standards including the *requirement that the principal's annual evaluation be based on student achievement data*, with a significant portion, as defined by the guidelines and criteria adopted by the board in accordance with § 49-1-302(d)(2), being student growth data as reflected in teacher effect data and Tennessee Value-Added Assessment System (TVAAS) data, as such data is developed pursuant to chapter 1, part 6 of this title.

T.C.A. § 49-2-303(a)(1) (emphasis added).

In Mason's affidavit, she made these observations about the Evaluation Model that the Board adopted to assess teachers and principals:

The evaluation of a Principal combines self-reflection, observation, input of school staff, and *student data*. There are two components-a qualitative component and a quantitative component . . . . The quantitative component of the evaluation of a Principal includes two sub-components known as Measures, *which are based upon student achievement data*, including a Growth Measure representing 35% of the Principal's score based upon student growth data (Tennessee Value-Added Assessment System [TVAAS] scores), and the Achievement Measure representing 15% of the Principal's score *based on agreed-upon measures of student achievement*.

(ECF No. 25-2 at PageID 229–30) (emphasis added.)

Based on this statement—which Plaintiff has not disputed by means other than "conclusory assertions, unsupported by specific facts made in affidavits"—the Court finds that the Evaluation Model considers the types of student achievement data that T.C.A. § 49-2-303(a)(1) requires. *Rachells*, 2012 WL 3648835, at *2 (quoting *Thomas*, 328 F.3d 890, 894 (7th Cir. 2003)).

And so, because the undisputed facts show that Plaintiff agreed, as part of her contract, that Defendants would assess her under the Evaluation Model, and that the Evaluation Model incorporates the types of student achievement data that T.C.A. § 49-2-303(a)(1) requires, the Court finds that Plaintiff's claim that her contract did not include performance standards is

unfounded.  Plaintiff has thus failed to make a colorable good faith and fair dealing claim as to this issue.[8]

### b.     The Board Did Not Violate its Policy Governing the Assignment and Transfer of School Personnel

The Court also finds that the undisputed facts here disprove Plaintiff's claim that the Board violated its own policy governing the assignment and transfer of school personnel.[9] (ECF No. 41 at PageID 1102–03.)  That policy puts forth these requirements:

> The Superintendent shall assign personnel to schools or departments by the 5th business day following the last instructional day of the school year for the upcoming school year.  If vacancies exist after the 5th business day following the last instructional day of the school year for the upcoming school year, the Superintendent shall hire and assign employees to meet the needs of the School District.

(ECF No. 42-7 at PageID 2012.)

Here, the undisputed facts show that, on "the last day of the school year," Mason told Plaintiff that Defendants would not renew her employment contract, and that "she would be assigned to a teaching position."  (ECF No. 41-1 at PageID 1119.)  They also show that Plaintiff received that teaching assignment about 18 days later.  (*Id.* at PageID 1120.)

That said, Plaintiff's employment contract as principal of Donelson Elementary School continued through the end of June 2018—more than one month after the school year ended.

---

[8] For the same reasons, the Court finds unnecessary to decide whether *Anderson*, 292 S.W.2d 198, applies here.

[9] As made clear in her response, Plaintiff alleges that the Board's alleged violation of its policy governing the assignment and transfer of school personnel shows that Plaintiff's demotion and transfer "was not acted upon in good faith" and thus violated the Teachers' Tenure Act.  (ECF No. 41 at PageID 1101.)  The Court reaffirms that it declines to decide whether this allegation would amount to a violation of the Teachers' Tenure Act.  Plus, as the Court explains below, the undisputed facts here show that the Board did not violate its policy governing the assignment and transfer of school personnel.

(*See* ECF No. 25-3 at PageID 283.)  Plus, as Plaintiff recognized in her own complaint, Mason

"had the right to transfer [her] to a position other than an Administrator as may be in the best

interest of the Board."  (ECF No. 1-1 at PageID 8.)  Mason further explained the nuance of that

discretion in her affidavit, which Plaintiff did not dispute in her response:

> 14.     Since the 2015-16 school year, a Principal's contract runs from
> July 1—more than one month prior to the beginning of the school year—through
> June 30—more than one month after the end of the school year, whereas a
> teacher's contract runs from on or about August 1—immediately before the
> beginning of the school year—through the last day of the school year, which is
> typically near the end of May.
>
> 15.     Whereas a teacher's employment automatically renews . . . unless
> the teacher receives notice within five business days following the last
> instructional day for the school year to be applicable to the next succeeding
> school year, a Principal does not have tenure in that position and the
> Superintendent has the discretion whether to renew a Principal contract.

(ECF No. 25-2 at PageID 230–31.)

As a result, given these undisputed facts, the Court finds that the Board did not breach its

duty of good faith and fair dealing by not renewing Plaintiff's employment contract as principal

of Donelson Elementary School, and by providing her with a teaching assignment in June 2018

before her contract expired.

For one, unlike ACS teachers whose employment contracts run until the end of the school

year, Plaintiff's employment as principal continued through June 30, 2018.  Plaintiff thus

received notice of her new assignment some 19 days before the end of her contract.  This is a

good thing.  Second, Plaintiff understood when entering into her employment contract that

Mason may transfer her to a teaching position if she thought doing so was in the Board's best

interests.  Third, taking Mason's testimony as true, the Court finds that the Board's policy

governing the assignment and transfer of school personnel hardly applies to principals.  As

Mason explained, "a Principal does not have tenure in that position and the Superintendent has

32

the discretion whether to renew a Principal contract" whether before or after the school year ended.

Together, these findings make clear that Plaintiff has not shown how the Board has failed "to honor the reasonable expectations of the contracting parties" or "to protect the rights of the parties to receive the benefits of the agreement into which they entered." *Lamar Advert. Co.*, 313 S.W.3d at 791. Because Plaintiff has failed to show that the Board violated its policy governing the assignment and transfer of school personnel, the Court finds that the Board did not violate its duty of good faith and fair dealing on this issue.

### c. Plaintiff's Evaluations and Donelson Elementary School's Academic Success Did Not Prohibit the Board from Demoting Plaintiff

The Court also finds that the Board did not breach its duty of good faith and fair dealing by not renewing Plaintiff's contract as principal of Donelson Elementary School despite Plaintiff's allegations that Donelson Elementary School was an award-winning school, and that she "constantly received excellent evaluations."[10] (ECF No. 41 at PageID 1103.)

As the Court mentioned above, "[t]he implied obligation of good faith and fair dealing does not . . . create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement." *Barnes*, 195 S.W.3d at 643 (quotation omitted). And here, Plaintiff's employment contract for the 2017-2018 states that Plaintiff "agrees and understands that the ACS Superintendent reserves the right to transfer

---

[10] Plaintiff alleges that, under Donelson Elementary School's success and Plaintiff's excellent evaluations, her demotion and transfer "could not have been for the efficient operation of" the ACS and "were arbitrary and capricious," thus making clear that the Board violated the Teachers' Tenure Act. (ECF No. 41 at PageID 1101, 1103) (citing *Crabtree*, 337 S.W.3d at 814). The Court once again declines to decide this issue at this stage in the litigation because Plaintiff has failed to plead a claim properly under the Teachers' Tenure Act.

Administrator to a position other than an Administrator position *as may be in the interest of the Board*." (ECF No. 25-3 at PageID 283) (emphasis added.)

Under this provision, even if Plaintiff is right in asserting that "Donelson was the highest achieving school in the District," and that Plaintiff received excellent evaluations as principal, she still agreed that Mason could demote and transfer her if doing so was in the best interest of the Board. (ECF No. 41 at PageID 1101; *see* ECF No. 25-3 at PageID 283). And Mason confirmed in her affidavit that she demoted and transferred Plaintiff for reasons that she thought were indeed in the Board's best interest:

> 129. Near the end of the 2017-2018 school year, I became aware that eleven teachers at Donelson Elementary School had resigned. This represented 21% of the faculty at Donelson Elementary School that year and was significantly higher than the four employees who would be leaving Arlington Elementary School.

> 130. I made the decision not to renew Ms. Davidson's Principal contract and to assign her to a teaching position on May 21, 2018, three days before the end of the school year.

> 131. *My decision was based upon the number of teachers who had resigned from Donelson Elementary School; the exit surveys and end-of year interviews that revealed numerous complaints from teachers about Ms. Davidson*, which included, but were not limited to, claims of bullying, harassment, threats and intimidation by Ms. Davidson; retaliatory conduct against teachers by Ms. Davidson; verbal and emotional abuse of teachers by Ms. Davidson; treating teachers disrespectfully; complaints made to me by parents about Ms. Davidson; her failure or refusals to follow my directions and Board policies; and due to the dismal climate surveys for Donelson Elementary School for the 2015-2016, 2016-2017 and 2017-2018 school years.

> 132. As Superintendent, I recognized that the District had a significant interest in avoiding the loss of more teachers at Donelson Elementary School; avoiding unnecessary disharmony among co-workers; avoiding unnecessary tension in the workplace; and avoiding potential lawsuits by teachers for harassment, intimidation and retaliation by Ms. Davidson.

> 133. As Superintendent, I have responsibilities to students, parents and employees of the District. The relationship between Superintendent and Principal is vital to the success of the District. The situation with Ms. Davidson had

progressed to the point that I no longer had confidence or trust in her.  I honestly believed then, and now, that her actions were adversely affecting the proper functioning of the District.

134.    Although I expected that she would react negatively to being reassigned to a teaching position, *I honestly believed at the time and still believe that removing Ms. Davidson from the position of Principal, in which she had abused her authority and repeatedly mistreated teachers to the point that they felt compelled to resign, and assigning her to a teaching position was in the best interest of Donelson Elementary School and the District.*

(ECF No. 25-2 at PageID 253–54.)

Plaintiff does not dispute that many teachers had resigned from Donelson Elementary School, and that the exit interviews and end-of-year interviews reflected poorly on her ability to maintain a positive atmosphere at the school.  (*See* ECF No. 41 at PageID 1103.)  Instead, Plaintiff argues that, despite these occurrences, the Board was not within its rights to demote and transfer her because of Donelson Elementary School's academic success and Plaintiff's positive written evaluations.  (ECF No. 41 at PageID 1103.)

The Court finds that the plain language of Plaintiff's employment contract undercuts Plaintiff's claim.  (ECF No. 25-3 at PageID 283.)

As the Court emphasized above, as long as Mason found that demoting and transferring Plaintiff was within the Board's best interest—which Mason has undisputedly found to be the case here—the Court cannot find that a breach of the duty of good faith and fair dealing has occurred.  *Lamar Advert. Co.*, 313 S.W.3d at 791 (citation omitted) ("The determination of what is required by the duty of good faith in a given case turns on an interpretation of the contract at issue.").  Finding a breach of that duty here, when the contract afforded tremendous leeway to the Board in deciding whether to demote or transfer Plaintiff, would be to scrutinize unduly a decision made by the Board that lies within its sound discretion.

For these reasons, the Court thus finds that there is no material issue of fact and Defendants are entitled to a judgment as a matter of law as to the claim that Defendants breached their duty of good faith and fair dealing toward Plaintiff.  The Court thus **GRANTS** Defendants' motion for summary judgment and **DISMISSES** Plaintiff's breach of the duty of good faith and fair dealing claim against the Board.

### III.   Negligence Claim

Plaintiff's final claim is for negligence.  (*See* ECF No. 1-1 at PageID 13.)  Much like her breach of the duty of good faith and fair dealing claim, Plaintiff claims that Mason was negligent because Mason allegedly did not "provide Plaintiff with a contract that included performance standards as required by T.C.A § 49-2-303(a)(l)."  (*Id.*)  Plaintiff also claims that Mason breached her "duty to provide a quality education to the students attending the ACS" when she "demoted Plaintiff for Plaintiff's alleged lack of people skills which is unrelated to inadequate performance . . . ."  (*Id.*)

Defendants argue that, if "Plaintiff seeks to argue that [the] Board somehow interfered with her contract, the Board has immunity pursuant to [T.C.A.] § 29-20-205."  (ECF No. 25-39 at PageID 1044.)  Defendants also claim that, "[a]s a matter of law, absent her official capacity, Mason owed no duty to Plaintiff."  (*Id.*)

The sum of Plaintiff's response is:  "With respect to Plaintiff's negligence claim, Defendants' arguments are insufficient to support a motion for summary judgment and as a result, Plaintiff respectfully requests that this court deny the Motion."  (ECF No. 41 at PageID 1103.)  The Court disagrees.

Because of Plaintiff's "perfunctory" response to Defendants' arguments, the Court need not address the merits of Plaintiff's negligence claim.  *McPherson v. Kelsey*, 125 F.3d 989,

995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation omitted).

Plaintiff has failed to "present 'affirmative evidence' to support [her] position." *Mitchell*, 964 F.2d at 584 (internal quotation omitted).  Nor has she made any effort to address Defendants' arguments.  The Court thus finds that Plaintiff has waived her negligence claim. *See Alexander v. Carter for Byrd*, 733 F. App'x 256, 261 (6th Cir. 2018) (finding that, because the plaintiff failed to respond to the defendant's argument related to the malicious prosecution claim "or otherwise to address that claim," "the district court properly deemed [the plaintiff's] malicious-prosecution claim waived").

What is more, even if Plaintiff didn't waive these claims, the Court would rule against her on the merits.  The Board is indeed immune from suit for any discretionary function.  Tenn. Code Ann. § 29-20-205(1).  As the Court mentioned above, the decision to move Plaintiff to a teaching position was a discretionary one.  And so Defendants are right about the Board's immunity.

As to the negligence claim against Mason, Plaintiff needed to provide evidence showing Mason owed her a duty beyond her role as superintendent.  She produced no such evidence. And so, the Court finds that there is no issue of fact and Defendants are entitled to judgment as a matter of law.

The Court thus **GRANTS** Defendants' motion for summary judgment as to Plaintiff's negligence claim.

## **CONCLUSION**

For the reasons above, the Court **GRANTS** Defendants' motion for summary judgment and **DISMISSES WITH PREJUDICE** Plaintiff's claims against Defendants.

**SO ORDERED**, this 21st day of July, 2020.

   s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE